UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 17-1705 (RC) |
| | : | | |
| v. | : | Re Document No.: | 28 |
| | : | | |
| $6,999,925.00 OF FUNDS ASSOCIATED WITH VELMUR MANAGEMENT PTE LTD, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

### I. INTRODUCTION

Plaintiff United States of America ("the government") seeks forfeiture and civil money penalties from two foreign companies that have allegedly acted as fronts for the Democratic People's Republic of Korea ("North Korea"). According to the government, these two companies—Velmur Management Pte. Ltd. ("Velmur") and Transatlantic Partners Pte. Ltd. ("Transatlantic")—made transactions on behalf of sanctioned North Korean entities, using the United States banking system, in contravention of federal law and United States sanctions on North Korea. Velmur failed to respond to the government's complaint, and the government asks this Court to enter a default judgment against it. For the reasons set forth below, the Court concludes that the government's factual allegations are sufficient to show that Velmur is liable for the offenses with which it is charged, that the government sent proper notice of this action to interested parties, and that the money the government claims under the forfeiture statute was involved in Velmur's offenses. However, the government's allegations support only a portion of

the civil money penalty it seeks against Velmur. Thus, the Court grants the government's motion for default judgment in full with respect to the forfeiture, and in part with respect to civil money penalties.

## II. FACTUAL BACKGROUND

This case began with an FBI investigation of Velmur and Transatlantic in connection with an alleged North Korean scheme to subvert international sanctions through the use of front companies. Compl. ¶ 1, ECF No. 1. According to the government: (1) North Korean banks directed Transatlantic and other front companies to send United States dollars to Velmur; (2) those front companies wired the money to Velmur, using United States banks as conduits; (3) Velmur then wired the money to a Russian gasoil supplier; which (4) shipped gasoil to North Korea. *See id.* ¶ 55. The government alleges that this scheme ran afoul of, among other laws, the International Emergency Economic Powers Act ("IEEPA") and federal anti-money laundering and bank fraud statutes.[1] The Court will briefly summarize those laws and then describe the alleged money laundering scheme in more detail.

### A. Statutory and Regulatory Framework

### 1. The International Emergency Economic Powers Act

The IEEPA authorizes the President to "deal with any unusual and extraordinary threat … to the national security, foreign policy, or economy of the United States" from outside the United States. 50 U.S.C. § 1701(a). This authority includes the ability to investigate "transactions in [the] foreign exchange" or "the importing or exporting of currency." *Id.* §

---

[1] The government also alleges that this scheme violated the North Korean Sanctions and Policy Enhancement Act ("NKSPEA"). 22 U.S.C. §§ 9201–9255. Because the government sufficiently alleged that Velmur violated the IEEPA and the anti-money laundering statute, the Court need not consider Velmur's liability under the NSKPEA.

2

1702(a)(1)(A). Exercising his IEEPA authority, President Bill Clinton issued Executive Order 12,938, which designates "Weapons of Mass Destruction" ("WMDs") as an "unusual and extraordinary threat" under the IEEPA. Exec. Order No. 12,938, 59 Fed. Reg. 58,099 (Nov. 14, 1994). Executive Order 13,382, issued a decade later, denies access to the United States banking system to anyone designated as a "proliferator" of WMDs. Exec. Order No. 13,382, 70 Fed. Reg. 38,567 (June 28, 2005). The "WMD Proliferators Sanctions Regulations," which implement Executive Order 13,382, "block" any property interests, including money and other financial instruments, belonging to or used in support of individuals and entities designated as WMD proliferators.[2] 31 C.F.R. §§ 544.201, 544.308. Those individuals and entities are placed on the "Specially Designated Nationals and Blocked Persons" list (the "SDN" list) administered by the Department of Treasury's Office of Foreign Assets Control ("OFAC"). *See id.* § 544.201(a). And Department of Treasury regulations bar the "provision of funds, goods, or services by, to, or for the benefit of any person" designated as an SDN, unless OFAC licenses the transactions. *Id.* § 544.201(b); *see also id.* §§ 544.202(c), 544.301, 544.405.

Section 206 of the IEEPA makes it "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under" the IEEPA. 50 U.S.C. § 1705(a). And property "which constitutes or is derived from proceeds traceable to" a violation of the IEEPA is subject to forfeiture. 18 U.S.C. § 981(a)(1)(C). "This chain of interlocking statutes can thus be summarized as follows: property that 'constitutes or is derived from proceeds traceable to' violations of executive orders . . . promulgated pursuant to the IEEPA is subject to forfeiture." *In re 650 Fifth Avenue & Related*

---

[2] If an account is "blocked," "payments, transfers, exportations, withdrawals, or other dealings may not be made" from that account unless licensed by the Office of Foreign Assets Control. 31 C.F.R. § 544.301.

*Props.*, 830 F.3d 66, 87 (2d Cir. 2016) (citing 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(D); 50 U.S.C. § 1705).

### 2. The Federal Anti-Money Laundering Statute

The federal anti-money laundering statute, 18 U.S.C. § 1956, makes it a crime to "transport[], transmit[], or transfer[] . . . a monetary instrument or funds from a place in the United States to or through a place outside the United States . . . with the intent to promote the carrying on of [a] specified unlawful activity."[3] 18 U.S.C. § 1956(a)(2)(A). "Specified unlawful activity" includes violating the IEEPA. *Id.* § 1956(c)(7)(D). Additionally, "any property . . . involved in a transaction . . . in violation of" the federal anti-money laundering statute is subject to forfeiture. *Id.* § 981(a)(1)(A). To show that the property was "involved in" such a transaction, the government must show that "there was a substantial connection between the property and the offense." *Id.* § 983(c)(3). A violator of the anti-money laundering statute is also liable "for a civil penalty of . . . the value of the property, funds, or monetary instruments involved in the transaction." *Id.* § 1956(b)(1)(A).

### B. Relevant Facts and Procedural History

In 2013, OFAC designated North Korea's primary foreign exchange bank, the Foreign Trade Bank ("FTB"), as an SDN. Compl. ¶¶ 19, 46. In 2016, the Department of Treasury's Financial Crimes Enforcement Network ("FinCEN") deemed "*the entire North Korean financial sector* as a jurisdiction of primary money laundering concern." *Id.* ¶ 27 (emphasis in original) (citing 81 Fed. Reg. 35,665 (June 3, 2016)). FinCEN found, in making that determination, that

---

[3] This statute also criminalizes conspiracy to engage in money laundering. 18 U.S.C. § 1956(h).

4

North Korea makes extensive use of front companies and deceptive financial practices to evade international sanctions. *Id.* ¶¶ 32, 50.

Velmur is registered in Singapore, and is purportedly a commercial and industrial real estate management company. *Id.* ¶¶ 58-59. Despite Velmur's legitimate-sounding business, the government alleges that it "bears the hallmarks of a front company"; it "lacks an official website and appears to have little to no web presence" while also not "having a true physical office space." *Id.* ¶ 59; Decl. Special Agent Benjamin Whitley ("Whitley Decl.") ¶ 6, ECF No. 28-2. Relying in part on confidential sources, the government contends that Velmur "has been a recipient of U.S. dollar payments on behalf of North Korean entities—in particular, FTB." Compl. ¶¶ 60-61.

During its investigation of Velmur, the FBI allegedly identified several payments made to or from Velmur, through United States banks, for the purpose of laundering money or purchasing gasoil on behalf of North Korea. *See id.* ¶ 84. In May 2017, OFAC blocked five of these transactions, totaling $4,999,925, that were described as "prepayment for gasoil" and that involved three alleged North Korean front companies. *See id.* ¶¶ 56, 85-93; Whitley Decl. ¶ 7. The blocked funds (the "Defendant Funds") are "currently held in a bank account in the United States." Compl. ¶ 10.[4] OFAC found that "an SDN had an interest in each one of the . . . transactions" and no SDN "obtain[ed] an OFAC license prior to engaging in the transactions." Whitley Decl. ¶ 7; *see also* Compl. ¶¶ 70, 72, 74. The transactions prompted OFAC, in August 2017, to designate Velmur as an SDN "for operating in the energy industry in the North Korean

---

[4] OFAC also blocked two wire transfers to Velmur from Transatlantic. *See id.* ¶ 56. Transatlantic has entered an appearance in this case, and the government has not yet sought forfeiture of the blocked payments involving Transatlantic. *See* Pl.'s Mem. Supp. Mot. Default J. ("Pl.'s Mem.") at 4 n.3, ECF No. 28-1.

5

economy," and for "attempt[ing] to use the U.S. financial system to send millions of dollars in payments on behalf of North Korea-related transactions." Compl. ¶ 57.

In addition to the transactions blocked by OFAC, the FBI's investigation identified several other Velmur transactions involving North Korean front companies and companies known to do business with North Korea. In early 2017, Velmur wired $6,853,000 over eight transactions to JSC Independent Petroleum Company ("IPC"), a Russian company, "for gasoil."[5] *Id.* ¶¶ 75–77; Whitley Decl. ¶ 13. OFAC subsequently designated IPC as an SDN, noting that it "had a contract to provide oil to North Korea and reportedly shipped over $1 million worth of petroleum products to North Korea." Compl. ¶ 75. One of the government's "reliable" confidential sources stated that IPC shipped the gasoil purchased by Velmur from a Russian port to North Korea. *Id.* ¶¶ 78-79. Through 2016 and 2017, Velmur was also the recipient of four United States dollar wire transfers, totaling $1,169,980, from companies known to be associated with or front companies for FTB. *Id.* ¶ 61. These companies are known "to have made payments for FTB" and are believed to have "laundered funds to promote sanctions violations". *Id.*

In August 2017, the government filed a verified complaint for forfeiture *in rem* against $6,999,925 in blocked funds associated with Velmur, and for civil money penalties *in personam* against Defendants Velmur and Transatlantic.[6] The government claims that the $6,999,925 was involved in Defendants' IEEPA and money laundering violations, and that the civil money

---

[5] The complaint includes a chart listing seven wire transfers that make up only $5,503,000 of the listed total of $6,853,000. Compl. ¶ 76. However, Special Agent Whitley's declaration provides the eighth wire transfer of $1,350,000, which brings the total up to the listed $6,853,000. Whitley Decl. ¶ 13.

[6] As noted, the blocked funds associated with Transatlantic are not at issue in the government's motion for default judgment. *See* Pl.'s Mem.

penalties are necessary to redress Defendants' money laundering violations. On February 9, 2018, the Clerk of the Court entered default as to the Defendant Funds and Defendants. *See* Clerk's Entry of Default as to Def. Funds, ECF No. 13; Clerk's Entry of Default as to Defs., ECF No. 14. Transatlantic then entered an appearance, *see* Notice of Appearance, ECF No. 15, and the government and Transatlantic "continue to have substantive conversations about the status of" this action. Status Report at 3, ECF No. 27. Velmur, however failed to appear, and the government has filed a motion for default judgement under Federal Rule of Civil Procedure 55, seeking forfeiture of the Defendant Funds—$4,999,925—and the imposition of $21,691,187.30 in civil money penalties against Velmur. Pl.'s Mot. Default J. 1-2, ECF No. 28. That motion is now before the Court.

### III. LEGAL STANDARDS

Federal Rule of Civil Procedure 55 establishes a two-step process for default judgment. Fed. R. Civ. P. 55; *see also Bricklayers & Trowel Trades Int'l Pension Fund v. KAFKA Construction, Inc.*, 273 F. Supp. 3d 177, 179 (D.D.C. 2017). First, a party must "request[] that the Clerk of the Court enter default against a party who has 'failed to plead or otherwise defend'" the action. *Bricklayers*, 273 F. Supp. 3d at 179 (quoting Fed. R. Civ. P. 55(a)). Then, the party must move for entry of default judgment and, upon the party's request, allow the court "to enter or effectuate judgment." Fed. R. Civ. P. 55(b).

"'[D]efault judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party. In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir.

1970)); *see also Gilmore v. Palestine Interim Self-Gov't Auth.*, 843 F.3d 958, 965 (D.C. Cir. 2016). However, "a defendant's failure to appear . . . do[es] not automatically entitle plaintiff to a default judgment." *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26 (D.D.C. 2008). Rather, "the defendant's default notwithstanding, the plaintiff is entitled to a default judgment only if the complaint states a claim for relief." *Id.* at 27 (quoting *Descent v. Kolitsidas*, 396 F. Supp. 2d 1315, 1316 (M.D. Fla. 2005). In other words, "[d]efault establishes the defaulting party's liability for the well-pleaded allegations of the complaint," but not for allegations that are not sufficiently pleaded. *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011) (citing *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001)).

## IV. ANALYSIS

The government asks this Court to authorize the forfeiture of certain funds belonging to Velmur, and to impose civil money penalties on Velmur. Although Velmur has not appeared to contest these claims, the Court must assure itself that the government has established Velmur's liability for both. Because the government has properly notified all interested parties and sufficiently alleged that Velmur's property is subject to forfeiture, the motion for default judgment is granted as it relates to the forfeiture. On the other hand, the government has not sufficiently alleged that Velmur is subject to the full amount of civil money penalties sought. The Court will impose a penalty less than that requested.

### A. Forfeiture

Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions governs *in rem* civil forfeiture actions. *See* Fed. R. Civ. P. Supp. R. G. It

contains both notice requirements and substantive pleading requirements.[7] *See* Fed. R. Civ. P. Supp. R. G(2), (4). The government has met those requirements here.

### 1. Notice

Supplemental Rule G requires the government to (1) publish public notice of a forfeiture and (2) provide direct notice to potential claimants of the property to be forfeited. Fed. R. Civ. P. Supp. R. G(4)(a), (b). The government must select one of three options for public notice, one of which is publication on an official government forfeiture website for at least thirty consecutive days. Fed. R. Civ. P. Supp. R. G(4)(a)(iii)–(iv). The publication must "describe the property with reasonable particularity," "state the times . . . to file a claim and to answer," and "name the government attorney to be served with the claim and answer." Fed. R. Civ. P. Supp. R. G(4)(a)(ii). The government must also "send notice of the action and a copy of the complaint to any person who reasonably appears to be a potential claimant." Fed. R. Civ. P. Supp. R. G(4)(b)(i). That notice "must be sent by means reasonably calculated to reach the potential claimant." Fed. R. Civ. P. Supp. R. G(4)(b)(iii)(A). That said, Supplemental Rule G "requires that the government attempt to provide actual notice; it does not require that the government demonstrate that it was successful in providing actual notice." *United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, 324 F. Supp. 3d 38, 47 (D.D.C. 2018) (quoting *Mesa Valderrama v. United States*, 417 F.3d 1189, 1197 (11th Cir. 2005)).

---

[7] Supplemental Rule G also requires that if—as is the case here—the subject of the seizure is not real property, the "clerk must issue a warrant to arrest the property if it is in the government's possession, custody, or control." Fed. R. Civ. P. Supp. R. G(3)(b)(i). The funds at issue here are in the government's control. *See* Compl. at 1, ¶ 10 ("The Defendant Funds are currently held in a bank account in the United States"). And the Clerk of Court issued a warrant for the funds' arrest one day after the government filed its complaint. *See* Warrant for Arrest *In Rem*, ECF No. 2. The government has thus met this Supplemental Rule G requirement.

Here, the government complied with Supplemental Rule G's public notice requirement. The government publicized the forfeiture on its official forfeiture website, http://www.forfeiture.gov, for thirty consecutive days in September and October 2017. Decl. of Publication, ECF No. 3; Pl.'s Mem. Supp. Mot. Default J. at 5, ECF No. 28-1. The publication described the funds, it provided a date by which interested parties were required to file a claim, November 23, 2017, and it named the government attorney to be served, Zia Faruqui. Decl. of Publication at 2.

The government also complied with Supplemental Rule G's direct notice requirement. It sent notice to potential claimants of the funds, including Velmur, at their registered addresses via international service in December 2017. *See* Status Report at 2–3, ECF No. 5; Aff. Supp. Default at 2–3, ECF No. 10; Clerk's Entry of Default as to Def. Funds. That notice included a copy of the complaint, and it notified the potential claimants that they could file a claim for the funds with this Court within thirty-five days of service. Aff. Supp. Default at 2–3. While the government has not shown that Velmur received the notice, proof of delivery is sufficient under Supplemental Rule G. *See Mingzheng*, 324 F. Supp. 3d at 47 (holding that the government's direct notice was "more than" sufficient when it sent "international package service to parties in China and the United Kingdom, and service through a Mutual Legal Assistance Treaty request to the potential claimant in Switzerland"); *United States v. Funds Up to and Including the Amount of $56,634 in U.S. Currency on Deposit in Banesco Int'l, Panama, Acct. # 201000274785, Titled in the Name of Inversiones Cedeno C.A., and/or Prop. Traceable Thereto*, 79 F. Supp. 3d 112, 114 (D.D.C. 2015) (holding that the government provided sufficient notice when it attempted, but failed, to obtain contact information for specific account holders related to the funds at issue, and it posted public notice of the forfeiture on its forfeiture website). Thus, the government has met Supplemental Rule G's notice requirements. *See* Fed. R. Civ. P. Supp. R. G(4).

## 2. Adequacy of the Complaint

Along with its notice requirements, "Supplemental Rule G sets the specifications of a complaint in an *in rem* forfeiture action." *Mingzheng*, 324 F. Supp. 3d at 45. The complaint must "be verified," state the grounds for jurisdiction and venue, "describe the property with reasonable particularity," "identify the statute under which the forfeiture action is brought," and "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Fed. R. Civ. P. Supp. R. G(2). Courts consider this a "higher standard of pleading" than that imposed by Federal Rule 8. *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008). Rule 8, however, "may help to clarify when a civil forfeiture complaint" states a claim. *United States v. $22,173.00 in U.S. Currency*, 716 F. Supp. 2d 245, 249 (S.D.N.Y. 2010).

The first four requirements of the complaint are largely formal and are easily met here. The complaint is verified; it identifies the basis for jurisdiction and venue; it describes the property at issue by (1) identifying the specific amount of money involved in Velmur's illicit transactions and blocked by OFAC, and (2) providing details about the wire transfers themselves; and it identifies the provisions under which forfeiture is sought as 18 U.S.C. § 981(a)(1)(A), which permits forfeiture of property involved in money laundering, and 18 U.S.C. § 981(a)(1)(C), which permits forfeiture of property traceable to IEEPA violations. *See* Compl. ¶¶ 9–10, 56, 85–104, at 33.

The fifth requirement is more substantive; the government must establish the legal basis for its claims. *See Mingzheng*, 324 F. Supp. 3d at 51. The government's forfeiture theory can be summarized as follows: the Defendant Funds are forfeitable because Velmur intended to use them to transact business, through United States banks, on behalf of SDNs without an OFAC

license, in violation of the IEEPA. Thus, the government must allege "sufficient facts to support a reasonable belief that [it] would be able to show at trial by a preponderance of the evidence that the transactions at issue were made on behalf of [SDNs]." *Id.* That standard, "which is not particularly onerous," has again been met here. *Id.* (citing *United States v. Aguilar*, 782 F.3d 1101, 1108–09 (9th Cir. 2015)).

Any entity that transacts with or on behalf of FTB—which was designated as an SDN in 2013—or other North Korean SDNs, through the United States financial system, must first obtain a license from OFAC. *See* 31 C.F.R. § 544.201(a); *United States v. All Wire Transactions Involving Dandong Zhicheng Metallic Material Co., Ltd.*, Nos. 17-mj-217, *et al.*, 2017 WL 3233062, at *1, 5 (D.D.C. May 22, 2017) (explaining that foreign entities that are acting on behalf of North Korean SDNs have committed violations of IEEPA and the anti-money laundering statute by conducting United States dollar wire transfers without first obtaining a license from OFAC). The government alleges that to subvert this restriction, North Korean financial institutions, including FTB, use front companies to send money through United States banks. *See* Compl. ¶¶ 50–54. Citing FinCEN and OFAC reports, the government claims, more specifically, that FTB "acts as North Korea's primary foreign exchange bank," and has "illegally laundered 'millions of U.S. dollars'" through front companies, including as recently as May 2017. *Id.* ¶¶ 45–49. This alleged elaborate network of front companies allows North Korea to execute commodities contracts in United States dollars that would otherwise be rendered impossible by international sanctions. *Id.* ¶¶65–69. For instance, North Korea and IPC allegedly entered into a gasoil contract in United States dollars, which was carried out through front companies using the United States banking system. *Id.* ¶ 75–80.

Having laid that groundwork, the government alleges that Velmur provided material support for North Korean front companies, including FTB front companies, by helping them purchase gasoil on behalf of North Korea. *Id.* ¶¶ 57–58. The government's confidential sources state that, despite Velmur's self-described activities as a real estate manager, its business "focuses on facilitating the laundering of funds for North Korean financial facilitators and sanctioned entities." *Id.* ¶¶ 58–61. The government alleges that the five wire transactions that transferred the Defendant Funds into Velmur's United States bank accounts were issued by front companies of designated North Korean banks, and were intended to facilitate Velmur's purchase of gasoil from IPC on behalf of North Korea. *Id.* ¶¶ 56, 70–93. True to form, Velmur allegedly wired nearly $7 million to IPC. *Id.* ¶ 76. And a confidential witness stated that a "clandestine FTB branch located outside of North Korea ordered a $1.09 million payment to be made via a[n] FTB front company to Velmur" during this period. *Id.* ¶ 81–82. IPC was subsequently designated as an SDN by OFAC. *Id.* ¶ 75. Notably, Velmur never sought OFAC licensing for the transactions. *See* Whitley Decl. ¶ 7. Thus, the government claims that Velmur violated the IEEPA because it conducted transactions on behalf of SDNs—FTB and others—through United States banks without obtaining OFAC licenses. *See* Compl. ¶¶ 70-74, 85-92, 99, 102; Whitley Decl. ¶ 7; *see also* 31 C.F.R §§ 544.202(c), 544.301, 544.405.

The government's allegations establish a reasonable basis to believe that it could show at trial that the Defendant Funds "constitute[d]" or were "derived from" IEEPA violations. 18 U.S.C. § 981(a)(1)(C). The funds were sent by SDN front companies to Velmur for the purpose of making transactions on behalf of those SDNs. That OFAC blocked each transaction because it concluded that an SDN had an interest in it, and that OFAC subsequently designated Velmur and IPC as SDNs, add additional weight to this conclusion. *See* Compl. ¶¶ 57, 85–93; Whitley

Decl. ¶ 7; *see also Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 702 (D.C. Cir. 1994) (stating that "OFAC[] . . . receives an even greater degree of deference than the *Chevron* standard"). The government "has thus surpassed its burden under Supplemental Rule G(2)." *Mingzheng*, 324 F. Supp. 3d at 53 (holding that blocked transactions made by FTB front companies to a different FTB front company were subject to forfeiture); *see also United States v. $396,589 in U.S. Funds*, 349 F. Supp. 3d 13, 21–22 (D.D.C. 2018) (holding that funds used to pay for specialized petroleum parts on behalf of Iran, in violation of sanctions on that country, were subject to forfeiture as proceeds traceable to an IEEPA violation).

The government's allegations also establish that the Defendant Funds are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C), as derived from proceeds traceable to violations of the anti-money laundering statute, *id.* § 1956. Section 1956 makes it unlawful to "transport[ ], transmit[ ], or transfer[ ] . . . a monetary instrument or funds . . . to a place in the United States from or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity," 18 U.S.C. § 1956(a)(2), or to conspire to do so, *see id.* § 1956(h). The government alleges that the SDN front companies wired the Defendant Funds from outside the United States with the intention that they pass through Velmur's United States bank accounts, with Velmur's knowledge and participation. *See* Compl. ¶¶ 56, 84–93. And as already discussed, the government alleges that these payments constitute or are derived from proceeds traceable to IEEPA violations, which are "specified unlawful activit[ies]" under § 1956. *See* 18 U.S.C. § 1956(c)(7)(D) (defining "specified unlawful activity" to include offenses under "section 206 ... of the [IEEPA]"). Thus, the government's well-pleaded allegations are sufficient to establish that the defendant funds are derived from proceeds traceable to a violation of §

1956(a)(2)(A), or at least a conspiracy to commit such a violation, and consequently § 981(a)(1)(A) provides an alternative ground for forfeiture of the defendant funds.[8]

### B. Civil Money Penalties

The government also asks this Court to impose civil money penalties on Velmur, as authorized by the anti-money laundering statute. Under that statute, an individual who violates subsection (a)(1) is "liable to the United States for a civil penalty" of up to the "value of the property, funds, or monetary instruments involved in the [illegal] transaction[s]." 18 U.S.C. § 1956(b).

The government's claim for civil money penalties is brought *in personam*, so it is not subject to Supplemental Rule G. Instead, Rule 8 of the Federal Rules of Civil Procedure sets the standard for *in personam* complaints. Rule 8 requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rule 8's standard is more permissive than the standard imposed by Supplemental Rule G. *See All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d at 16. Further, "[w]hen moving for default judgment, a plaintiff must prove that it is entitled to the requested damages." *Commodity Futures Trading Comm'n v. GIGFX, LLC*, 844 F. Supp. 2d 58, 64 (D.D.C. 2012) (citing *R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002)).

---

[8] The government's allegations are also sufficient to demonstrate that there exists a "substantial connection between the [Defendant Funds] and the [alleged] offense[s]," as required by 18 U.S.C. § 983(c)(3). The Defendant Funds were necessary to carry out the gasoil transactions intended to subvert the IEEPA.

15

As noted, the government has sufficiently alleged that Velmur violated the federal anti-money laundering statute with respect to the Defendant Funds. Velmur received the Defendant Funds on behalf of SDNs without properly obtaining a license from OFAC, and the transactions involved the movement of money across United States borders. Compl. ¶¶ 46, 70-74, 85-92; Whitley Decl. ¶ 7. Thus, Velmur is subject to civil money penalties up to "the value of the property, funds, or monetary instruments involved in the transaction[s]." 18 U.S.C. § 1956(b)(1)(A). The government, however, also seeks civil money penalties arising from additional Velmur transactions.

First, the government identifies eight wire transfers from Velmur to IPC between February and Aril 2017, each wire referencing payment "[f]or Gasoil." *See* Compl. ¶¶ 76-78; Whitley Decl. ¶¶ 13–14. The wires totaled $6,853,000. *See* Compl. ¶ 76; Whitley Decl. ¶ 13. A confidential source stated that around the same time, pursuant to a different contract with Velmur, IPC shipped diesel fuel from a Russian port known as a key waypoint for shipments to North Korea. *See* Whitley Decl. ¶¶ 15–16. And as discussed above, both IPC and Velmur were subsequently designated by OFAC as operating to provide gasoil to North Korea in contravention of United States sanctions. *See* Compl. ¶¶ 57, 75; Whitley Decl. ¶¶ 8–9. Given Velmur's other money laundering activities and the government's allegation that both IPC and Velmur were operating under agreements with FTB, the government has plausibly alleged that Velmur's payments to IPC were made on behalf of an SDN without an OFAC license. Thus, the two entities transmitted money through the United States banking system "with the intent to promote the carrying on of specified unlawful activity," the IEEPA, in violation of 18 U.S.C. § 1956(a)(2)(A). Velmur is subject to civil money penalties up to the total amount of its transactions with IPC. *See id.* § 1956(b)(1)(A).

Second, the government identifies four wire transfers allegedly sent by FTB affiliates and front companies to Velmur. Compl. ¶ 61; Whitley Decl. ¶ 12. In September 2016, Velmur received a $230,000 wire transfer from Dandong Zhicheng Metallic Material Company, which was subsequently found to have laundered money on behalf of North Korea. *See* Compl. ¶ 61(a); Whitley Decl. ¶ 12(a); *see also Dandong*, 2017 WL 3233062, at *5 (finding probable cause that Dandong was a North Korean front company engaged in IEEPA violations, justifying the forfeiture of Dandong funds routed through United States banks). In July 2016, Velmur received $189,980 from Ruizhi Resources Limited, a company found to be a front for Dandong Zhicheng. *See* Compl. ¶ 61(b); Whitley Decl. ¶ 12(b). Sometime in 2016, Velmur received "more than $250,000" from "Company A," which a confidential source identified as an FTB front company that was directed by FTB to wire money to Velmur. *See* Compl. ¶ 61(c); Whitley Decl. ¶ 12(c). Similarly, sometime in 2017, Velmur received "more than $500,000" from "Company B," which the same confidential source identified as another FTB front company that was directed by FTB to wire money to Velmur. *See* Compl. ¶ 61(d); Whitley Decl. ¶ 12(d). Again, the government's allegations with respect to these transactions are sufficient to show that Velmur knowingly transacted across United States borders on behalf of SDNs without obtaining OFAC licenses, in violation of the IEEPA and 18 U.S.C. § 1956(a)(2)(A). Again, Velmur is subject to civil money penalties up to the total amount of these illicit transactions. *See* 18 U.S.C. § 1956(b)(1)(A).

The government alleges that in total, Velmur "was a counterparty to [thirty-five] illicit wire transfers in U.S. dollars from known North Korean financial facilitators, totaling $14,838,187.50, which funds were routed through U.S. correspondent banking accounts." Whitley Decl. ¶ 12. Adding those funds to the $6,853,000 wired by Velmur to IPC, *see* Whitley Decl. ¶ 13, the government seeks civil money penalties of $21,691,187.30, s*ee id.* ¶ 20. Aside

from the specific transactions described above, however, the government provides no details on the thirty-five alleged illicit wire transfers. The Court will not award civil money penalties for those unknown wire transfers, because the government has not sufficiently alleged that those transfers were involved in IEEPA and money laundering violations. Even under the permissive default judgment standard, the Court will not blindly accept the government's assertion of liability without any factual support. *See United States v. Country Flavor Corp.*, 825 F. Supp. 2d 1296, 1305–08 (Ct. Int'l Trade 2012) (declining to award a civil money penalty unsupported by the government's factual assertions). Instead, the Court will "make an independent determination of the sum to be awarded" as civil money penalties. *Commodity Futures Trading*, 844 F. Supp. 2d at 64 (citing *Adkins*, 180 F. Supp. 2d at 17). The following charts summarize the factually supported illicit wire transfers described by the government:

| Wire Transactions to Velmur for Gasoil Purchase (Defendant Funds) | | |
|---|---|---|
| Date | Wire Amount | Source |
| 05/05/17 | $1,199,975 (Compl. ¶ 85) | Company 1 |
| 05/09/2017 | $1,099,975 (*Id.* ¶ 86) | Company 1 |
| 05/10/2017 | $999,975 (*Id.*) | Company 1 |
| 05/12/2017 | $1,200,000 (*Id.* ¶ 89) | Company 2 |
| 05/24/2017 | $500,000 (*Id.* ¶ 92) | Company 3 |
|  | **Total: $4,999,925** |  |

| Wire Transactions from Velmur for Gasoil Purchase |||
| Date | Wire Amount | Destination |
| --- | --- | --- |
| 02/27/2017 | $1,907,000 (*Id.* ¶ 76) | IPC |
| 03/01/2017 | $337,000 (*Id.*) | IPC |
| 03/24/2017 | $530,000 (*Id.*) | IPC |
| 03/28/2017 | $1,370,000 (*Id.*) | IPC |
| 03/31/2017 | $200,000 (*Id.*) | IPC |
| 04/07/2017 | $790,000 (*Id.*) | IPC |
| 04/19/2017 | $369,000 (*Id.*) | IPC |
| 05/03/2017 | $1,350,000 (Whitley Decl. ¶ 13) | IPC |
|  | **Total: $6,853,000** |  |

| Other Illicit Wire Transactions to Velmur |||
| Date | Wire Amount | Source |
| --- | --- | --- |
| September 2016 | $230,000 (Compl. ¶ 61(a)) | Dandong Zhicheng |
| July 2016 | $189,980 (*Id.* ¶ 61(b)) | Ruizhi Resources |
| 2016 | $250,000 (*Id.* ¶ 61(c)) | FTB Front Company A |
| 2017 | $500,000 (*Id.* ¶ 61(d)) | FTB Front Company B |
|  | **Total: $1,169,980** |  |

These transactions total $13,022,905. The United States may collect a civil money penalty in this amount from Velmur, representing "the value of the property, funds, or monetary instruments involved in" Velmur's violations of the anti-money laundering statute. 18 U.S.C. § 1956(b)(1)(A).

19

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** the government's Motion for Default Judgment (ECF No. 28) as it relates to forfeiture and **GRANTS IN PART** the Motion for Default Judgments as it relates to civil money penalties. The Defendant Funds, $4,999,925, are forfeited to the United States, and judgment is entered in favor of the United States and against Velmur in the amount of $13,022,905. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 22, 2019                                                      RUDOLPH CONTRERAS
                                                                                                  United States District Judge