UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 17-1705 (RC) |
| $2,000,000.00 OF FUNDS ASSOCIATED | ) | |
| WITH VELMUR MANAGEMENT PTE LTD, | ) | |
| | ) | |
| Defendant *In Rem* | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
ENTRY OF DEFAULT JUDGMENT AS TO DEFENDANT PROPERTIES
<u>ASSOCIATED WITH TRANSATLANTIC PARTNERS PTD. LTD.</u>**

On August 22, 2017, the United States commenced an *in personam* civil action against

Velmur Management PTE LTD ("Velmur") and TransAtlantic Partners PTE. LTD.

("TransAtlantic"), and an *in rem* action against $6,999,925.00 associated with Velmur and

TransAtlantic ("Defendant Properties"), among others.[1]  The action was filed pursuant to Federal

Rule of Civil Procedure 55(b)(2) and 18 U.S.C. § 981(a) as to the *in rem* defendants, and

pursuant to 18 U.S.C. § 1956(b) as to the *in personam* defendants.  Default was entered against

all Defendants on February 9, 2018.  This matter is now ripe for entry of a default judgment;

specifically, the United States requests forfeiture of $2,000,000.00, representing Defendant

Properties.

**<u>FACTUAL BACKGROUND</u>**

---

[1] On March 22, 2019, this Court entered default judgment as to $4,999,925.00 in defendant
properties associated with Velmur and against defendant Velmur.  The final defendant, defendant
TransAtlantic, is the subject of a separate pleading.

This action arises out of an investigation by the Federal Bureau of Investigation ("FBI") into a scheme operated by Velmur and TransAtlantic—companies sanctioned by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC")—to launder U.S. dollars through the United States on behalf of sanctioned entities in the Democratic People's Republic of Korea ("North Korea").  *See* Complaint (ECF 1) at ¶ 1.  The specific allegations are set forth in the United States' Complaint.

North Korea has used sanctioned state-run banks, including the Foreign Trade Bank ("FTB"), to work with a host of front companies in order to access the U.S. financial system and evade the U.S. sanctions imposed on these banks and their sanctioned affiliates.  Complaint (ECF 1) at ¶ 2.

On August 22, 2017, OFAC designated Velmur and TransAtlantic pursuant to Executive Order 13382, which targets WMD proliferators and their supporters, and Executive Order 13722, which targets, in part, North Korea's energy and financial services industries.  *Id.* at ¶¶ 57 and 65.  OFAC designated Velmur and TransAtlantic for operating in the energy industry in the North Korean economy, by importing gasoil[2] to North Korea.  *Id.*  The designation noted that Velmur and TransAtlantic have sold gasoil to North Korea and that it has attempted to use the U.S. financial system to send millions of dollars in payments on behalf of North Korea-related transactions.  *Id.*

TransAtlantic bears the hallmarks of a front company.  *Id.* at ¶ 67.  It lacks an official website and appears to have little to no web presence.  Additionally, law enforcement is unaware

---

[2] "Gasoil" is often used to refer to a distilled petroleum product such as gasoline and/or diesel fuel.

of TransAtlantic having a true physical office space, as numerous companies are registered at the same location.  *Id.*

A reliable confidential source (CS-1) independently revealed that TransAtlantic entered into a contract with Velmur on December 6, 2016, for the purchase by TransAtlantic of 5,000 metric tons of gasoil.  Complaint (ECF 1) at ¶ 68.  CS-1 further revealed that on May 11, 2017, there was an addendum to the original contract.  This contract corroborates the relationship between TransAtlantic and Velmur.  *Id.*

The Defendant Properties and related transactions by Velmur and TransAtlantic were routed through U.S. correspondent banking accounts, including the funds identified in the Complaint as the Defendant Properties.  *Id.* at ¶ 56.  Specifically, the Defendant Properties are as follows:

| # | Date | Wire Amount | Party Sending Wire | Party Receiving Wire | Wire Detail |
|---|------|-------------|--------------------|----------------------|-------------|
| i | 05/12/17 | $1,510,000.00 | TransAtlantic | Velmur | Prepayment for Gasoil Against Contract 05/06.16 DD 06.12.2016 |
| ii. | 06/01/17 | $490,000.00 | TransAtlantic | Velmur | Prepayment for Gasoil Against Contract 5TP DD 11.5.2017 |
|  |  | **$2,000,000.00** | **Total** |  |  |

*Id.* at ¶ 56.

At the same time North Korean front companies were wiring the illicit payments to Velmur, Velmur sent money to only one company, JSC Independent Petroleum Company ("IPC"), a Russian petroleum products supplier.  Those transfers totaled $6,853,000.  Complaint (ECF 1) at ¶ 76.  IPC has also been designated by OFAC.  *Id.* at ¶ 75. The designation noted that

IPC had a contract to provide oil to North Korea and reportedly shipped over $1 million worth of petroleum products to North Korea.  *Id.*

A confidential reliable source (CS-2) provided bill of lading information for a related shipment by IPC to Velmur on May 19, 2017.  *Id.* at ¶ 78.  The cargo was identified as diesel fuel.  The bill of lading revealed that IPC sent the diesel fuel shipment on tankers departing from Port Vladivostok, Russia, a known waypoint for Russian transshipments to North Korea.  *Id.* The ultimate destination of this transshipment by Velmur, and all other by transshipments by Velmur, was North Korea.  *Id.*; *see* Whitley Decl. at ¶ 16.

Accordingly, Velmur, although registered as a real estate management company, was in fact a North Korean financial facilitator involved with laundering funds for the benefit of North Korea.  Complaint (ECF 1) at ¶ 80.  Velmur was involved with illegal money laundering transactions, including with TransAtlantic.  *Id.*

These transfers from TransAtlantic to Velmur were in violation of IEEPA, the conspiracy statute, and the federal money laundering statute.    Accordingly, the Defendant Properties, totaling $2,000,000.00, are subject to forfeiture, pursuant to 18 U.S.C. § 981.

## **PROCEDURAL HISTORY**

The United States filed its Verified Complaint for Forfeiture *In Rem* on August 22, 2017. *See* ECF 1. On August 23, 2017, the Clerk of the Court entered a Warrant for Arrest *In Rem*.  *See* ECF 2.

On September 25, 2017, the United States commenced notification of this forfeiture action via publication on an internet site, http://www.forfeiture.gov, for 30 consecutive days. [3]

---

[3] The Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules") govern civil forfeiture actions *in rem* arising from a federal statute. *See* Supplemental Rule A(1)(B). The Federal Rules of Civil Procedure also apply, except to the

Publication ended on October 24, 2017.  Thus, claims based on publication were due by November 23, 2017.  *See* Supp. Rule G(5)(a)(ii); Notice of Publication (ECF 3).  No party filed a claim based on publication, and the time to do so has expired.  *See* Affidavit of Service (ECF 12).

In addition to this public notice, the United States identified potential claimants as to the Defendant Properties in Singapore and China.[4]  U.S. law enforcement officials effected service on those entities consistent with Singaporean and Chinese law, by sending notice via international package service on or about November 7, 2017 and December 13, 2017.  *See* Affidavit of Service (ECF 12); Clerk's Entry of Default as to *In Rem* Defendants (ECF 13).  The deadline for potential claimants who received direct notice to file a verified claim was January 17, 2018. This deadline passed without any potential claimants filing a claim as to the Defendant Properties Associated with Velmur.  *See* Affidavit of Service (ECF 12).  On February 28, 2018, Counsel for TransAtlantic filed a notice of intention to seek relief from default.  *See* Notice (ECF 16).  Counsel for TransAtlantic recently has informed the government that it will not contest the forfeiture action.

On February 9, 2018, the Clerk of the Court entered default as to the Defendant Properties.  *See* Clerk's Entry of Default as to *In Rem* Defendants (ECF 13); Fed. R. Civ. P. Rule 55(a) (clerk must enter default when a party has failed to plead or otherwise defend).  This matter is now ripe for entry of default judgment against the Defendant Properties.

---

extent they are inconsistent with the Supplemental Rules. *See* Supp. Rule A(2). Supplemental Rule G(4) governs the process by which the government must serve notice of the Complaint. Notice is required to the public via publication, as well as to potential claimants via direct notice. Supp. Rule G(4).

[4] Supplemental Rule G also requires that the government send direct notice "to any person who reasonably appears to be a potential claimant on the facts known to the government." Supp. Rule G(4)(b)(i).

## STANDARDS FOR ENTRY OF DEFAULT JUDGMENT

In cases where the claim is not for a "sum certain" or a sum that can be computed with certainty, the party seeking a default judgment must apply to the court.  Fed. R. Civ. P. 55(b)(2);[5] *Canady v. Erbe Elektromedizin GMBH*, 307 F. Supp. 2d 2, 8-9 (D.D.C. 2004); *United States v. Gant*, 268 F. Supp. 2d 29, 32 (D.D.C. 2003).  The court has the power to enter default judgment "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules." Fed. R. Civ. P. 55(a); *Int'l Painters & Allied Trades Indus. Pension Fund v. Zak Architectural Metal & Glass, LLC*, 635 F. Supp. 2d 21, 23 (D.D.C. 2009) (citing *Keegel v. Key W. & Caribbean Trading Co.*, 627 F.2d 372, 375 n. 5 (D.C. Cir.1980)). This authority applies equally in the context of a civil forfeiture action.  *See, e.g., United States v. $23,000 in U.S. Currency*, 356 F.3d 157, 163 (1st Cir. 2004) (Rule 55 applies equally in the civil forfeiture context); *United States v. $6,500.00 in U.S. Currency*, No. 1:10-cv-327, 2010 WL 4365886, at *1 (E.D. Tex. Nov. 2, 2010), *report & recommendation adopted sub nom. United States v. & 6,500.00 in U.S. Currency*, No. 1:10-CV-327, 2010 WL 4365890, at *1 (E.D. Tex. Nov. 3, 2010).  Default judgment is available "when the adversary process has been halted because of an essentially unresponsive party . . . [as] the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir.1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C.Cir.1970)).

Although there is a general policy favoring decisions on the merits, if potential claimants fail to respond to a complaint, "a decision on the merits is impractical, if not impossible." *United*

---

[5] A default judgment cannot be entered against an unrepresented minor or incompetent person, *see* Fed. R. Civ. P. 55(b)(2), but neither exception applies to the Defendant Funds Associated with Velmur or to Defendant Velmur.  *See* Complaint (ECF 1) at ¶¶ 10, 11.

*States v. Approximately $45,860 in U.S. Currency*, No. 14-CV-03801-JCS, 2015 WL 1387468, at *4 (N.D. Cal. Mar. 24, 2015). "A denial of default judgment would prejudice the government in that it would be required to expend further time and effort in an action where no claimants [] have appeared. Without a default judgment, the government may be without recourse altogether." *United States v. Real Prop. & Improvements Located at 929 Clay St., Unit #7, San Francisco, CA*, No. 15-CV-00010-JD, 2015 WL 3547256, at *3 (N.D. Cal. June 5, 2015).

The court's primary inquiry when considering default is whether notice has been adequately served, and if any party filed a timely claim. *See United States v. $4,620 in U.S. Currency*, 779 F. Supp. 2d 65, 67 (D.D.C. 2011) (default was appropriate because the government "provided sufficient notice of the seizure of the defendant property," and no party filed a timely claim); *see also United States v. Remington, Model 58, 12 Gauge Shotgun, SN: £9181V*, No. 1:11-CV-330, 2012 WL 1466684, at *1 (E.D. Tex. Feb. 7, 2012), report and recommendation adopted, No. 1:11-cv-330, 2012 WL 1466682 (E.D. Tex. Apr. 26, 2012) (default judgment entered upon showing government's compliance with Supplemental Rule G(4)); *United States v. 1999 Lexus GS400*, No. C 05–1139, 2007 WL 1056791, *2-3 (N.D. Cal. 2007) ("Default may be entered upon a showing that: (a) notice has been given as required by Admiralty Local Rule 6–1; (b) the time to answer has expired; and (c) no one has appeared to claim the property.").

Assuming proper notice, the court's second consideration before entering default judgment is whether the complaint establishes a reasonable belief of forfeitability. *See United States v. $1,071,251.44 of Funds Associated with Mingzheng Int'l Trading Ltd.*, No. 17-cv-01166, 2018 WL 3949962, at *4 (D.D.C. June 29, 2018) (*citing United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008), report and recommendation adopted, No. 17-CV-1166, 2018 WL 3941949 (D.D.C. Aug. 15, 2018). "Default establishes the defaulting party's

liability for the well-pleaded allegations of the complaint." *Boland v. Smith & Rogers Constr. Ltd.*, 201 F. Supp. 3d 144, 147 (D.D.C. 2016); *see also Int'l Painters & Allied Trades Indus. Pension Fund v. Dettrey's Allstate Painting, LLC*, 763 F. Supp. 2d 32, 34 (D.D.C. 2011) (same) (citing *Adkins v. Teseo*, 180 F.Supp.2d 15, 17 (D.D.C. 2001) (same)).   A court must treat "the factual allegations in a complaint, other than those as to damages . . . as conceded by the defendant." *DIRECTV, Inc. v. Pepe*, 431 F.3d 162, 165 (3d Cir.2005); *see also Int'l Painters & Allied Trades Indus. Pension Fund v. R. W. Amrine Drywall Co., Inc.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002) (the "defaulting defendant is deemed to admit every well-pleaded allegation in the complaint" upon entry of default by the clerk) (citation omitted).

## ARGUMENT

### I.      The United States Is Entitled To Entry Of A Default Judgment Against The Defendant Properties

In this case, the Clerk of Court properly entered default the Defendant Properties, pursuant to Rule 55(a), upon the United States' showing that these defendants failed to plead or otherwise defend this action.  *See* Clerk's Entry of Default as to *In Rem* Defendants (ECF 13).  Moreover, the well-pleaded allegations of the Complaint establish *prima facie* forfeitability of the Defendant Properties, valued at $2,000,000.00.

A.  The United States has satisfied its notice obligations to these defendants.

"Reasonable notice" requires only that the government attempt to provide actual notice, but it does not require proof that the notice was received.  *See Valderrama v. United States*, 417 F. 3d 1189, 1197 (11th Cir. 2005); *United States v. Funds Up to & including the Amount of $56,634 in U.S. Currency on Deposit in Banesco Int'l, Panama*, 79 F. Supp. 3d 112, 114 (D.D.C. 2015) (notice was adequate based on public notice on the government's forfeiture website).  Where "the government attempted to provide notice and heard nothing back indicating that anything had gone awry, courts have found the government's efforts comply with due process."  *Lewis v. United States*, No. 14-cv-496, 2014 WL 6065538, at *6 (S.D. Cal. Nov. 3, 2014) (citing *Jones v. Flowers*, 547 U.S. 220, 226 (2006)).  *See also* Supp. Rule G(4)(b)(iv) ("[a] potential claimant who had actual notice of a forfeiture action may not oppose or seek relief from forfeiture because of the government's failure to send the required notice").

In this case, the United States satisfied its notice obligations by publishing its action on the government's forfeiture website and by mailing direct notice to TransAtlantic and other potential claimants.  Additionally, counsel for TransAtlantic made an appearance in these proceedings, before ultimately deciding not to contest the forfeiture.  The Clerk of Court determined that the notice requirements were satisfied when it entered default in this matter on February 9, 2018.  *See* Clerk's Entry of Default as to *In Rem* Defendants (ECF 13).

B.  Default judgment is appropriate because the Complaint provides a well-pleaded basis for relief.

The well-pleaded facts in the United States' Complaint establish a reasonable belief of forfeitability on which the Court may enter judgment.  The Defendant Properties were subject to an OFAC blocking order.  *See* Whitley Decl. at ¶ 7 (ECF 28). This Court may take judicial notice of such action by OFAC.  *See Youkelsone v. FDIC*, 910 F. Supp. 2d 213, 221 (D.D.C.

9

2012), *aff'd* 560 F. App'x 4 (D.C. Cir. 2014) ("In deciding a motion under Federal Rule of Civil Procedure 12(b)(6), a court may take judicial notice of public records from other proceedings," citing *Covad Commc'ns Co. v. Bell Atl. Co.,* 407 F. 3d 1220, 1222 (D.C. Cir. 2005)); *see also EEOC v. St. Francis Xavier Parochial Sch.*, 117 F. 3d 621, 624 (D.C. Cir.1997) (on motion to dismiss, court may consider "matters of which [it] may take judicial notice").  Indeed, a blocking order from OFAC, and related findings that a company is a front company for a designated entity are entitled to deference.  *See In re 650 Fifth Ave.*, No. 08-cv-10934, 2013 WL 2451067, at \*5–6 (S.D.N.Y. June 6, 2013). "OFAC has been delegated the authority to administer the SDN listing regime, and the Court must therefore give effect to its informal adjudications, unless they are 'plainly inconsistent' with the relevant statutes and OFAC regulations." *Id.*; *Consarc Corp. v. Iraqi Ministry.* 27 F. 3d 695, 702 (D.C. Cir. 1994), citing *Chevron U.S.A. Inc. v. NRDC,* 467 U.S. 837, 844–45 (1984).  "Given OFAC's unique expertise in matters of terrorist finance and the sensitive nature of the investigations upon which OFAC makes its determinations, it is entitled to deference even greater than that afforded an administrative agency statutory interpretation under *Chevron." See In re 650 Fifth Ave.*, 2013 WL 2451067, at \*5–6; *see also Holy Land Found. for Relief & Dev. v. Ashcroft,* 219 F. Supp. 2d 57, 68 (D.D.C. 2002) *aff'd,* 333 F. 3d 156 (D.C. Cir. 2003) (OFAC interpretation of "legally enforceable interest" entitled to deference).  OFAC's blocking of the Defendant Properties should receive such deference.  OFAC's blocking of the Defendant Properties involved a determination that each transaction was a violation of IEEPA and the related North Korean Executive Orders on the blocking of property because the transactions were for the benefit of a SDN.  *See* Whitley Decl. at ¶ 7 (ECF 28).  This finding, when uncontested, is basis enough to order forfeiture. Moreover, the subsequent designations of Velmur and TransAtlantic are an independent basis (due similar deference), which creates a

factual predicate for a reasonable belief that Velmur and TransAtlantic acted exclusively for the benefit of sanctioned North Korean entities.

Moreover, the facts, which must be taken to be true, sufficiently plead a reasonable belief of forfeitability, because the United States has specified:

- the perpetrators of the IEEPA, NKSPEA, and money laundering conspiracy (FTB, Velmur, and TransAtlantic),  *see e.g.,* Complaint (ECF 1) at ¶ 55;

- the victim of the conspiracy (the United States), *see e.g., Id.* at ¶ 32;

- the goal of the conspiracy (to allow sanctioned North Korean entities to procure gasoil via front companies transacting in U.S. dollars, in spite of sanctions preventing them from doing so), *see e.g.,* ¶ 56;

- the means of effectuating the goals (wire payments to specific counterparties), *see e.g.,* ¶¶ 56, 76; and

- which members of the conspiracy were responsible for which acts (Velmur for conducting receiving wires from North Korean financial facilitators such as TransAtlantic, and then laundering such funds to IPC), *see e.g.,* ¶ 55, 76; *see also* Whitley Decl. at ¶ 12.

*See All Assets Held In Account No. XXXXXXXX*, 83 F. Supp. 3d at 373 (complaint sufficiently pled a reasonable belief of forfeitability, because the government specified the victim of the alleged fraud; the perpetrators of the alleged fraud; the goal of the fraud; the means of effectuating the fraud; and which members of the fraud were responsible for which acts).

Taking the facts of the Complaint and the attached declaration as true, the United States has established that: Velmur entered into an agreement with IPC, FTB, TransAtlantic, and other parties known and unknown to commit offenses (i.e., IEEPA and the money laundering statute) against the United States; and that  Velmur's surreptitious activities (i.e., overt acts), including its

registration as front company, its transactions with front companies, and concealment of North Korea as the true beneficiary of the transactions in question demonstrate Velmur's knowledge that its agreement was for an unlawful purpose.  Thus, the United States has established a violation of the conspiracy statute, 18 U.S.C. § 371, and the money laundering conspiracy statute, 18 U.S.C. § 1956(h).  *See United States v. Trie*, 23 F. Supp. 2d 55, 59 (D.D.C. 1998) ("The essential elements of a conspiracy charge are (1) an agreement among two or more persons, (2) either to commit an offense against the United States or to defraud the United States, (3) with knowledge of the conspiracy and with actual participation in it, where (4) one or more of the co-conspirators takes any overt act in furtherance of the conspiracy."); *United States v. Cobble*, No. 13-cr-200 (RWR), 2015 WL 5173887, at \*2 (D.D.C. Sept. 2, 2015) (government must show: "(1) agreed to commit a money laundering offense, and (2) knowingly and voluntarily participated in that agreement.") (internal citation omitted).

Moreover, the facts of the Complaint and the attached declaration satisfy the elements of a civil IEEPA forfeiture claim. 18 U.S.C. § 981(a)(1)(C) mandates the forfeiture of proceeds of violations of Section 206 of IEEPA (which is defined as a specified unlawful activity in 18 U.S.C. § 1956(c)(7)(D)).  TransAtlantic wired Velmur U.S. dollars, which transited through the United States, for the benefit of sanctioned North Korean entities, without having first obtained a license from OFAC, knowing that such license was needed.  TransAtlantic and Velmur's knowledge is again demonstrated by its activities to conceal the true nature of its transactions (i.e., using front companies, transacting with covert overseas branch representatives of the FTB, and acting as a front company itself).  Such actions violate IEEPA.  *See United States v. Quinn*, 403 F. Supp. 2d 57, 65 (D.D.C. 2005) (elements of IEEPA are: (1) an illegal export or provision of services; (2) failure to obtain the necessary license from OFAC; (3) the defendant acted

knowingly and willfully; and (4) the defendant knew that a license was required). The bar for the forfeiture of proceeds of an IEEPA violation is lower in the civil context, as willfulness is not a civil element. *See United States v. All Funds on Deposit in United Bank of Switzerland*, 2003 WL 56999, at \*6-7 (S.D.N.Y. Jan. 7, 2003) (J. Rakoff) (willfulness not required in civil forfeiture of IEEPA proceeds). This is because the definition in 18 U.S.C. § 1956(c)(7)(D), which incorporates forfeiture, ties IEEPA to violations of "section 206," which incorporates both civil and criminal violations of IEEPA. Section 206 states that while criminal violations of IEEPA require willfulness, civil violations do not.

The money laundering claims against TransAtlantic and Velmur are similarly sufficiently pled. Section 981(a)(1)(A) (money laundering forfeiture authority) "provides, therefore, for broader forfeiture than 18 U.S.C. 981(a)(1)(C), the IEEPA forfeiture provision. If entitlement to forfeiture is shown under this section, then "any property" "involved in" or "traceable to" the violation is subject to forfeiture." *In re 650 Fifth Ave.*, No. 08.-cv-10934, 2013 WL 5178677, at \*30 (S.D.N.Y. Sept. 16, 2013), *vacated and remanded sub nom. on other grounds* (*In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66 (2d Cir. 2016)). To prove a violation of 18 U.S.C. § 1956(a)(2)(A), the government must show the movement of funds across the border of the United States, which promoted the carrying on of a specified unlawful activity (i.e., IEEPA and NKSPEA). *See United States v. Piervinanzi*, 23 F.3d 670, 680 (2d Cir. 1994). The United States need not prove that the funds involved in the transaction are illicit, because Congress excised the term proceeds from this provision. *See id.* The Defendant Properties crossed into the United States and promoted violations of IEEPA.

This Court has found *probable cause* for forfeiture, a much higher standard than the reasonable belief required here, on similar facts. *See, e.g., Dandong Zhicheng*, 2017 WL

3233062, at *5 (affidavit established probable cause to believe that the funds in question were subject to forfeiture based on violations of the money laundering statute and IEEPA and the prohibitions of NKSEPA, because the transactions being routed through U.S. correspondent banks were consistent with generalized patterns of North Korean money laundering activities, and because the government catalogued numerous transactions between the target company and other entities known to conduct business with or on behalf of North Korea). In *Dandong Zhicheng*, this Court accepted a counterparty analysis similar to the one detailed in the attached affidavit – that is by showing consistent transactions with North Korean financial facilitators (even pre-designation), the government can establish IEEPA and money laundering violations. *Id.* The information provided by CS-1 and CS-2, as well as subpoena returns, revealed North Korea- related contracts and accounts, illicit payment instructions by the FTB, and indicia of the involvement of front companies, which, when taken to be true, all support finding reasonable belief that there has been a violation of the money laundering statute. Thus, the Defendant Properties are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), as the proceeds of and/or funds involved in violations of 18 U.S.C. § 1956(a)(2)(A).

## **CONCLUSION**

For the foregoing reasons, and, upon consideration of the record in this case, including a showing of compliance with applicable rules regarding service of process and notice by publication, the default entered by the Clerk of the Court, and taking the well-pleaded allegations of the Complaint as true, the United States respectfully requests that its motion for entry of default judgment be granted. *See 8 Gilcrease Lane*, 638 F.3d at 299 (upholding district court's order for default judgment and final order of forfeiture, because there were no valid claims); *United States v. $9,928.00 in U.S. Currency*, 10-cv-1728, 2012 WL 1004873, at *1 (D.D.C. Mar.

27, 2012) (ordering default where government submitted affidavit certifying that it gave

appropriate notice and that no claims were filed); *United States v. $4,620 in U.S. Currency*, 779

F. Supp. 2d 65, 67 (D.D.C. 2011) (ordering default where court struck sole claimant's claim,

leaving no claimants to the defendant funds).  As reflected in the proposed order accompanying

the Motion, the United States asks specifically that the Court order the Defendant Properties,

valued at $2,000,000.00, be forfeited to the United States.


                           Respectfully submitted,


                           JESSIE K. LIU, D.C. Bar No. 472845
                           United States Attorney for the District of Columbia


                    By:            /s/ *Zia Faruqui*
                           Zia M. Faruqui, D.C. Bar No. 494990
                           Assistant United States Attorneys
                           555 Fourth Street, N.W.
                           Washington, D.C. 20530
                           (202) 252-7117 (Faruqui)
                           zia.faruqui@usdoj.gov

December 20, 2019          *Attorneys for the United States of America*