**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 17-1705 (RC) |
| | : | | |
| v. | : | Re Document No.: | 41 |
| | : | | |
| $6,999,925.00 OF FUNDS ASSOCIATED | : | | |
| WITH VELMUR MANAGEMENT PTE LTD, | : | | |
| *et. al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

GRANTING PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT

**I.  INTRODUCTION**

Plaintiff United States of America ("the Government") seeks forfeiture from

Transatlantic Partners Pte. Ltd. ("Transatlantic") for using the United States banking system in

order to make transactions on behalf of sanctioned North Korean entities in violation of federal

law.  Transatlantic made an initial appearance in this matter but has since failed to respond to the

Government's complaint.  As a result, the Government asks the Court to enter default judgment

against Transatlantic.  For the reasons set forth below, the Court finds that the Government's

factual allegations are sufficient to show that proper notice of this action was provided to

interested parties, that the funds sought were the funds involved in Transatlantic's offenses, and

that Transatlantic is liable for the offenses for which it is charged.  Thus, the Court grants the

Government's motion for default judgment.

## II.  BACKGROUND

This case stems from an FBI investigation highlighting North Korea's pattern of deploying state-controlled front companies to execute commodities contracts that would otherwise be barred by international sanctions.  Compl. ¶¶ 1, 65–69, ECF No. 1.  The Government alleges that Defendant Transatlantic acted as an intermediary in this illicit scheme by using the United States banking system to wire funds that were used as prepayment for gasoil shipments to North Korea.  *See id*. ¶¶ 55–56.  The Government argues that this activity violates both the International Emergency Economic Powers Act ("IEEPA") and the federal anti-money laundering statute.  The Court will briefly discuss each of those laws and then explain the factual background in more detail.

### A.  Statutory and Regulatory Framework

The Government cites two provisions under which forfeiture is sought: 18 U.S.C. § 981(a)(1)(C), which permits forfeiture of property traceable to IEEPA violations, and 18 U.S.C. § 981(a)(1)(A), which permits forfeiture of property related to money laundering.  *See* Compl. ¶¶ 7, 100, 104; Mem. Supp. Pl.'s Motion for Def. J. 12–14, ECF No. 41.  The Court will first describe the International Emergency Economic Powers Act and then turn to the anti-money laundering statute.

### 1.  *The International Emergency and Economic Powers Act*

IEEPA authorizes the President to "deal with any unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States" that comes from outside of the United States.  50 U.S.C. § 1701(a).  This includes the ability to "investigate, regulate, or prohibit" certain transactions, including "any transactions in foreign exchange."  50 U.S.C. § 1702(a)(1)(A).  Pursuant to this authority, President Bill Clinton issued Executive Order 12,938,

which established that the proliferation of Weapons of Mass Destruction ("WMDs") constitutes an "unusual and extraordinary threat" under IEEPA.  Exec. Order No. 12,938, 59 Fed. Reg. 58,099 (Nov. 14, 1994).  President Clinton identified several North Korean entities as WMD proliferators and imposed sanctions on North Korea as a result of that finding.  Compl. ¶ 16.  A subsequent executive order, issued over a decade later, denied access to the United States banking system to anyone designated as a "proliferator" of WMDs.  Exec. Order No. 13,382, 70 Fed. Reg. 38,567 (June 28, 2005).

The Treasury Department's Office of Foreign Assets Control places individuals determined to be proliferators on the Specially Designated Nationals and Block Persons List (the "SDN" list).  31 C.F.R. §§ 544.201, 544.308.  There are several consequences to a designation by OFAC.  For example, Treasury regulations "block"[1] any property interests, including money and other financial instruments, belonging to or used in support of individuals and entities placed on the SDN list.  *Id.* § 544.201.  Furthermore, both U.S. and non-U.S. persons are prohibited from facilitating the "provision of funds, goods, or services by, to, or for the benefit of any person" on the SDN list, unless OFAC specifically licenses the transaction.  *Id.* § 544.201(b); *see also id.* §§ 544.202(c), 544.301, 544.405.

Section 206 of the IEEPA makes it "unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under" the statute.  50 U.S.C. § 1705(a).  Additionally, "any property, real or personal, which constitutes or is derived from proceeds traceable to a violation" of the IEEPA is subject to civil forfeiture.  18 U.S.C. § 981(a)(1)(C).  "This chain of interlocking statutes can thus be

---

[1] When an account is "blocked," "payments, transfers, exportations, withdrawals, or other dealings may not be made" from that account unless licensed by OFAC.  31 C.F.R. § 544.301.

summarized as follows: property that 'constitutes or is derived from proceeds traceable to' violations of executive orders . . . promulgated pursuant to the IEEPA is subject to forfeiture." *In re 650 Fifth Avenue & Related Props.*, 830 F.3d 66, 87 (2d Cir. 2016) (citing 18 U.S.C. §§ 981(a)(1)(C), 1956(c)(7)(D); 50 U.S.C. § 1705.); *see also United States v. $396,589 in U.S. Funds*, 349 F. Supp. 3d 13, 21–22 (D.D.C. 2018) (finding that funds paid to Iran were forfeitable because the payments constituted a violation of regulations issued pursuant to IEEPA that forbid exports to Iran without a license).

### 2. *The Anti-Money Laundering Statute*

The federal anti-money laundering statute makes it a crime to "transport[], transmit[], or transfer[] . . . funds from a place in the United States to or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(2)(A).  Violations of IEEPA constitute "specified unlawful activity."  *Id.* § 1956(c)(7)(d).  Furthermore, any property involved in a transaction or attempted transaction in violation of the statute is subject to civil forfeiture.  *Id.* § 981(a)(1)(A).  In order to show that the relevant property was "involved in" a violation of the money laundering statute, the Government must demonstrate a "substantial connection between the property and the offense."  *Id*. § 983(c)(3).  Thus, the Government is required to show that the property subject to forfeiture has a "substantial connection" to the "specified unlawful activity" at issue.  *Id.*

### B.  Relevant Facts[2]

This case involves North Korea's financial sector, which depends on state-controlled financial institutions that use front companies to conduct international financial transactions.

---

[2] The Court's explanation of the background in this case applies the standard of Federal Rule of Civil Procedure 12(b)(6) and assumes "all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Compl. ¶ 41. Some of these financial institutions have been designated by OFAC as supporters of North Korea's WMD program, and, pursuant to that designation, are listed on OFAC's SDN list. *Id.* ¶ 33. Specifically, in 2013, OFAC designated North Korea's primary foreign exchange bank, the Foreign Trade Bank ("FTB") as an SDN. *Id.* ¶¶ 19, 46. Subsequent to this determination, the Treasury Department's Financial Crimes Enforcement Network ("FinCen") deemed "*the entire North Korean financial sector* as a jurisdiction of primary money laundering concern." *Id.* ¶ 27 (emphasis in original). Nevertheless, FinCen has found that North Korean financial institutions continue to access the U.S. financial system, in violation of U.S. sanctions, by using money laundering techniques to conceal North Korea's involvement. *Id.* ¶ 42.

The Government contends that Transatlantic is a piece of one such scheme. Transatlantic is a corporation allegedly headquartered in Singapore that conducts its primary business in "General Wholesale Trade." *Id.* ¶¶ 12, 66. The Government claims that Transatlantic resembles a front company, given that it does not have an official website, appears to have "little to no web presence," and does not seem to have a "true physical office space, as numerous companies are registered at their [same] official location." *Id.* ¶ 67.

Based on information provided by several confidential sources, the Government asserts that Transatlantic wired funds through the United States in order to purchase gasoil on behalf of North Korea in U.S. dollars. *Id.* ¶¶ 91–92. On December 6, 2016, Transatlantic allegedly entered into a contract with Velmur, a company with similar characteristics, including lack of physical office space and little to no web presence. *Id.* ¶ 59. Between May and June 2017, Transatlantic wired funds to Velmur through U.S. correspondent bank accounts. *Id.* ¶ 56. A confidential source provided the Government with details of each wire transaction. *Id.* ¶ 60. On May 12, 2017, Transatlantic wired $1,510,000.00 to Velmur, noting that it was prepayment for

gasoil. *Id.* ¶¶ 56, 91. On June 1, 2017, Transatlantic wired an additional $490,000.00 to Velmur with the same notation. *Id.* ¶¶ 56, 93.

The Government alleges that Velmur then remitted these funds to JSC Independent Petroleum Company ("IPC"), a Russian oil supply company. *Id.* ¶ 76. A confidential source provided a bill of lading information noting that IPC shipped cargo identified as diesel fuel to Velmur from Port Valdivostok, Russia, which the Government argues is a known waypoint for Russian shipments to North Korea. *Id.* ¶ 78. Additionally, the Government explains that publicly available shipping data shows a steady pattern of oil tanker traffic from this port to North Korea. *Id.*

Ultimately, OFAC designated IPC as an SDN after determining that IPC had an explicit contract to provide oil to North Korea. *Id.* ¶ 75; Decl. Special Agent Benjamin Whitley ("Whitley Decl.") ¶ 8, ECF No. 28-2. OFAC eventually made the same determination about both Transatlantic and Velmur. On August 22, 2017, OFAC designated Transatlantic as an SDN for operating in the energy industry in the North Korean economy. Compl. ¶ 65. OFAC's designation highlighted that Transatlantic had contracted with Daesong Credit Development Bank to purchase fuel oil on behalf of North Korea, a bank that had already been placed on OFAC's SDN list. *Id.* ¶ 65. OFAC also designated Velmur as an SDN, noting that the company materially assisted in supplying gasoil to North Korea. *Id.* ¶ 57.

### C. Procedural History

In August 2017, the Government filed a complaint for civil money penalties *in personam*[3] against Velmur and Transatlantic, and an *in rem* action seeking to recover

---

[3] The *in personam* claims have since been resolved. *See* Mem. Op. Granting In Part Pl.'s Mot. for Def. J. at 15–20, ECF No. 34 (granting in part Defendants' motion for default judgment

$6,999.925.00 associated with Velmur.  On August 23, 2017, the Clerk of the Court entered a

Warrant for Arrest *In Rem*.  ECF No. 2.  After Velmur failed to appear, the Government filed a

motion for default judgment against Velmur and Defendant Funds totaling $4,999,925.00, which

this Court granted on March 22, 2018.  Mem. Op. Granting in Part Pl.'s Mot. for Default J. 20,

ECF No. 34.

Unlike Velmur, Transatlantic filed an initial appearance and was therefore not subject to

the initial motion for default judgment.  However, Transatlantic has since informed the

Government that it will not contest the forfeiture action.  *See* Pl.'s Mem. Supp. Mot. Default J. at

5, ECF No. 41-1.  The Government has now filed a motion for default judgment against

Transatlantic seeking forfeiture of the remaining Defendant Funds, which amount to

$2,000,000.00 stemming from the transactions between Velmur and Transatlantic.  That motion

is now before the Court.

### III.  LEGAL STANDARD

Federal Rule of Civil Procedure 55 establishes a two-step process for default judgment.

Fed. R. Civ. P. 55; *see also Bricklayers & Trowel Trades Int'l Pension Fund v. KAFK

Construction, Inc.*, 273 F. Supp. 3d 177, 179 (D.D.C. 2017).  First, a party must "request[] that

the Clerk of the Court enter default judgment against a party who has 'failed to plead or

otherwise defend'" the action.  *Bricklayers*, 273 F. Supp. 3d at 179 (quoting Fed. R. Civ. P.

55(a)).  Then, the party must move for entry of default judgment and, upon the party's request,

allow the court "to enter or effectuate judgment."  Fed. R. Civ. P. 55(b).

---

seeking civil money penalties against Velmur), and Notice of Dismissal at 1, ECF No. 42 (noting
the Government's dismissal of its *in personam* action against Transatlantic).

"'[D]efault judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party. In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellchaft Gerbruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)); *see also Gilmore v. Palestine Interim Self-Gov't Auth.*, 843 F.3d 958, 965 (D.C. Cir. 2016)). However, "a defendant's failure to appear . . . do[es] not automatically entitle [a] plaintiff to a default judgment." *Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26 (D.D.C. 2008). Rather, "the defendant's default notwithstanding, the plaintiff is entitled to a default judgment only if the complaint states a claim for relief." *Id.* at 27 (quoting *Descent v. Kolitsidas*, 396 F. Supp. 2d 1315, 1316 (M.D. Fla. 2005)). In other words, "[d]efault establishes the defaulting party's liability for the well-pleaded allegations of the complaint," but not for allegations that are not sufficiently pleaded. *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011) (citing *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001)).

## IV. ANALYSIS

The Government asks this Court to authorize the forfeiture of funds wired by Transatlantic to Velmur. Although the Government alleges that Transatlantic does not plan to contest the forfeiture action, the Court must nevertheless assure itself that liability has been established in order to grant the motion for default judgment. Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, which governs in rem civil forfeiture actions, contains both notice requirements and substantive pleading requirements.[4]

---

[4] Supplemental Rule G also requires that if the subject of the seizure is not real property, the "clerk must issue a warrant to arrest the property if it is in the Government's possession, custody, or control." Fed. R. Civ. P. Supp. R. G(3)(b)(i). Here, the funds at issue are in the

*See* Fed. R. Civ. P. Supp. R. G(4)(a), (b).  As set forth below, because the Government has

provided adequate notice and sufficiently alleged that Transatlantic's property is subject to

forfeiture, the motion for default judgment is granted.

## A.  Notice

Supplemental Rule G requires (1) public notice of a forfeiture and (2) direct notice to

potential claimants of the property to be forfeited.  Fed. R. Civ. P. Supp. R. G(4)(a)–(b).  One

option for public notice is publication on an official Government website for at least thirty

consecutive days.  Fed. R. Civ. P. Supp. R. G(4)(a)(iii)(B).  To satisfy this requirement, the

publication must "describe the property with reasonable particularity," "state the times…to file a

claim and to answer," and "name the Government attorneys to be served with the claim and

answer."  Fed. R. Civ. P. Supp. R. G(4)(a)(ii).  Although the notice "must be sent by means

reasonably calculated to reach the potential claimant," Fed. R. Civ. P. Supp. R. G(4)(b)(iii)(A),

Supplemental Rule G does not require that the Government "demonstrate that it was successful

in providing actual notice."  *United States v. $1,071,251.44 of Funds Assoc. with Mingzheng Int'l

Trading Ltd.*, 324 F. Supp. 3d 38, 47 (D.D.C. 2018) (quoting *Mesa Valderrama v. United States*,

417 F.3d 1189, 1197 (11th Cir. 2005)).

The Government has satisfied these requirements here.  The United States published this

action on the Government's forfeiture website, http://www.forfeiture.gov, for thirty consecutive

days between September 25 and October 24, 2017.  Decl. of Publication, ECF No. 3; Pl.'s Mem.

Supp. Mot. Default J. at 5, ECF No. 41-1 at 4–5.  The website described the property with

particularity by specifying the amount of funds implicated in the action and by stating that those

---

Government's control.  Compl. ¶ 10.  Further, the Clerk of the Court issued a warrant for the
funds' arrest the day after the Government filed its complaint.  *See* Warrant for Arrest *In Rem*,
ECF No. 2.  Therefore, the Government has met this Supplemental Rule G requirement.

funds were "associated with Velmur Management LTD." Decl. of Publication at 2. The

publication also provided a date by which interested parties were required to file a claim,

November 23, 2017, and named the Government attorney to be served, Assistant United States

Attorney Zia Faruqui. *Id.*

Additionally, the Government complied with Supplemental Rule G's direct notice

requirement. The Government mailed notice to potential claimants, including Transatlantic, at

their registered addresses via international package service in December 2017. Status Report at

3, ECF No. 5; *see also* Aff. Supp. Def. at ¶¶ 6, 10–12, ECF No. 10. The notice included a copy

of the complaint and informed the potential claimants that they could file a claim for the funds

within thirty-five days of service, or no later than January 17, 2018. Aff. Supp. Default at ¶¶ 5–

6.

Finally, although the Government has not demonstrated that Transatlantic received the

notice, proof of delivery is enough to satisfy this requirement under Supplemental Rule G. *See*

*Mingzheng*, 324 F. Supp. 3d at 47 (holding that delivering notice through international package

service after contacting officials was "more than sufficient" to meet Supplemental Rule G(4)(b));

*United States v. Funds Up to and Including the Amount of $56,634 in U.S. Currency on Deposit*

*in Banesco Int'l, Panama, Acct. #201000274785, Titled in the Name of Inversiones Cedeno C.A.,*

*and/or Prop. Traceable Thereto*, 79 F. Supp. 3d 112, 114 (D.D.C. 2015) (finding notice was

reasonably calculated to reach potential claimants where the Government attempted to obtain the

account holders' contact information). Here, the Government worked with U.S. law enforcement

officials to identify potential claimants. Aff. Supp. Default at ¶ 6. The Government then mailed

notice to Transatlantic via FedEx. *Id.* at ¶ 11. According to FedEx tracking records, the notice

package was delivered on December 18, 2017.  *Id.*  Thus, the Government has met Supplemental

Rule G's notice requirements.

## B.  Adequacy of the Complaint

In addition to its notice requirements, Supplemental Rule G sets the standards for a

complaint in an *in rem* forfeiture action.  *Mingzheng*, 324 F. Supp. 3d at 45.  The complaint must

be verified and state the grounds for jurisdiction and venue.  Fed. R. Civ. P. Supp. R. G(2).

Additionally, the complaint must describe the property at issue with "reasonable particularity"

and identify the statute under which the forfeiture action is brought.  *Id.*  Lastly, the complaint

must "state sufficiently detailed facts to support a reasonable belief that the Government will be

able to meet its burden of proof at trial."  *Id.*  This is considered a "higher standard of pleading"

than the standard imposed by Federal Rule of Civil Procedure 8.  *United States v. All Assets Held*

*at Bank Julius Baer & Co., Ltd.*, 571 F. Supp. 2d 1, 16 (D.D.C. 2008).  However, Rule 8 can

"help to clarify when a civil forfeiture complaint" adequately states a claim.  *United States v.*

*$22,173.00 in U.S. Currenc*y, 716 F. Supp. 2d 245, 249 (S.D.N.Y. 2010).

Here, the first four requirements are clearly met.  The complaint is verified and identifies

the bases for jurisdiction and venue.  Compl. ¶ 9.  The Government also describes the particular

property at issue by identifying the specific amount of money wired from Transatlantic to

Velmur, and by providing details about the two wires, including the date and stated purpose for

both transactions.  Compl. ¶¶ 56, 91, 93.  Furthermore, the complaint identifies the provisions

under which forfeiture is sought: 18 U.S.C. § 981(a)(1)(A), which permits forfeiture of property

related to money laundering, and 18 U.S.C. § 981(a)(1)(C), which permits forfeiture of property

traceable to IEEPA violations.  *See* Compl. ¶¶ 7, 100, 104.

To satisfy the fifth substantive pleading requirement, the Government must establish the legal basis for its claims by stating sufficiently detailed facts to support a reasonable belief that the Government will be able to meet its burden at trial. *See Mingzheng*, 324 F. Supp 3d at 51. Here, the Government alleges that Defendant Funds are forfeitable because Transatlantic wired money through the United States banking system to Velmur, which then used Defendant Funds to purchase gasoil on behalf of North Korea's Foreign Trade Bank in violation of IEEPA. Therefore, to meet this pleading standard, the Government must allege sufficient facts to support a "reasonable belief that [it] would be able to show by a preponderance of the evidence that the transactions at issue were made on behalf of [SDNs]." *Id.* As the Court next discusses, the Government has met that standard here.

### 1. IEEPA Violation

Any entity that transacts with or on behalf of an SDN through the United States financial system must first obtain a license from OFAC. *See* 31 C.F.R. § 544.201(a); *United States v. All Wire Transactions Involving Dandong Zhicheng Metallic Material Co., Ltd.*, *et al.*, Nos. 17-mj-217-24, 2017 WL 3233062, at *1, 5 (D.D.C. May 22, 2017) (noting that foreign entities acting on behalf of North Korean SDNs violate IEEPA by conducting wire transfers through the United States without obtaining a license from OFAC). In this case, the Government alleges that North Korean financial institutions have established a scheme to avoid IEEPA's licensing requirement and evade United States sanctions by using front companies to send money through United States banks. *See* Compl. ¶¶ 50–54. North Korea's Foreign Trade Bank is one such financial facilitator. The Government cites both U.N. and OFAC sanction designations to show that North Korea's FTB serves as an "umbrella bank" for foreign currency transactions made on behalf of

North Korea, including transactions that have resulted in the illegal laundering of "millions of U.S. dollars" through the United States. *Id.* ¶¶ 45–49.

Consistent with this scheme, the Government alleges that Transatlantic acted as a front company to facilitate the purchase of gasoil on behalf of North Korea by wiring funds to Velmur, which in turn sought to procure gasoil from IPC in U.S. dollars. *Id.* ¶¶ 55, 94. A confidential Government source revealed that Transatlantic contracted with Velmur on December 6, 2016, for the purchase of 5,000 metric tons of gasoil. *Id.* ¶ 68. Transatlantic then wired $1,510,000.00 to Velmur on May 12, 2017. Transatlantic sent Velmur an additional sum of $490,000.00 on June 1, 2017, *id.* ¶¶ 91, 93, making the total amount sent on the two dates $2,000,000.00. The details of each wire transfer confirm that the transactions were made as prepayment for gasoil. *Id.* ¶ 56.

The Government further claims that as Transatlantic wired payments to Velmur, Velmur remitted funds to only one company, IPC. *Id.* ¶ 76. An additional confidential source confirmed that IPC sent a diesel fuel shipment to Velmur on tankers that departed from Port Vladivostok, Russia. *Id.* ¶ 78. The Government cites publicly available shipping data that shows a consistent flow of oil tanker traffic from this port city into North Korean ports during the month of shipment. *Id.* Thus, the Government argues that Transatlantic violated the IEEPA because it sent illicit U.S. dollar payments to Velmur through the United States on behalf of FTB, without obtaining OFAC licenses for the transactions. *See id.* ¶¶ 64–69, 99, 102.

Taken together, these facts demonstrate a reasonable basis to believe that the Government could show at trial that Defendant Funds "constitute[d]" or were "derived from" IEEPA violations. 18 U.S.C. § 981(a)(1)(C). Transatlantic made two wire payments to Velmur for the prepayment of gasoil. During the time of the wire transfers between May and June 2017, the only company receiving funds from Velmur was IPC, which consistently shipped diesel fuel to

13

North Korea.  Furthermore, the fact that OFAC subsequently designated Transatlantic, Velmur, and IPC lends additional support for the reasonable belief that Transatlantic acted for the benefit of sanctioned North Korean entities.  Compl. ¶¶ 57, 65, 75; *see also Consarc Corp. v. Iraqi Ministry*, 27 F.3d 695, 702 (D.C. Cir. 1994) (stating that "OFAC[]. . . receives an even greater degree of deference than the *Chevron* standard").  In August 2017, OFAC specifically designated Transatlantic for operating in the energy industry in the North Korean economy, particularly by contracting with Daesong Credit Development Bank to purchase fuel oil.  Compl. ¶ 65.  This relationship is consistent with the overall scheme that the Government has alleged: North Korean banks subvert OFAC licensing requirements, and thus violate IEEPA, by using trading companies to remit wire transfers in U.S. dollars on behalf of sanctioned North Korean entities. *Id*. ¶ 53.

### 2. *Anti-Money Laundering Statute Violation*

The Government has also alleged sufficient facts to establish that Defendant Funds are forfeitable under 18 U.S.C. § 981(a)(1)(A) because the proceeds are traceable to violations of the anti-money laundering statute.  *Id.* § 1956.  To demonstrate a money laundering violation, the Government must show movement of funds across the United States border that promoted the carrying on of a specified unlawful activity.  *See id.* § 1956(a)(2).  The Government makes two arguments to show such movement of funds.  First, as the Court just discussed, the Government alleges that these funds were wired for the benefit of sanctioned North Korean entities, without having first received a license from OFAC to conduct such transactions.  *See* Compl. ¶ 94, 98–104.  These payments constitute "specified unlawful activit[ies]" under § 1956.  *See* 18 U.S.C. § 1956(c)(7)(D) (defining "specified unlawful activity" to include offenses listed in "section 206 . . . of the [IEEPA]").  Additionally, the Government alleges that Transatlantic wired Defendant

14

Funds to Velmur with the intention that they pass through Velmur's United States bank accounts. Compl. ¶ 91, 93. The Government claims that these transactions match the pattern of conduct relayed by a confidential source, who explained that FTB provides payment instructions to front companies like Transatlantic to route funds through Velmur's U.S. dollar accounts. *Id.* ¶¶ 80–84. Further, Transatlantic took steps to conceal the nature of these transactions and the intended beneficiary. For example, Transatlantic bears characteristics emblematic of a front company: it has little to no web presence and does not have an official website, nor any true physical office space. *Id.* ¶ 67. The involvement of a front company, combined with illicit payment instructions by the FTB, suggest that the Government's allegations could support a reasonable belief that Defendant Funds are derived from proceeds traceable to a violation of 18 U.S.C. § 1956(a)(2)(A). Thus, the Government has sufficiently alleged that Transatlantic's payments to Velmur totaling $2,000,000.00 are forfeitable because the transactions violate both IEEPA and the federal anti-money laundering statute. Accordingly, the Court resolves the motion for default judgment in favor of the Government.

## V.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Government's Motion for Default Judgment (ECF No. 41). The Defendant Funds, $2,000,000.00, are forfeited to the United States, and judgment is entered in favor of the United States and against Transatlantic. An Order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated: March 23, 2020                                          RUDOLPH CONTRERAS
                                                               United States District Judge